UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LESLIE T. WEEKLY, | |
| Plaintiff, | No. 20 CV 01786 |
| v. | Judge Mary M. Rowland |
| FIFTH THIRD BANK, NATIONAL ASSOCIATION, | |
| Defendant. | |

**MEMORANDUM OPINION & ORDER**

Leslie T. Weekly ("Weekly") alleges Fifth Third Bank, National Association ("Fifth Third") violated the Telephone Consumer Protection Act ("TCPA") and the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA"). Fifth Third has filed a motion to dismiss. (Dkt. 13). For the reasons stated below, this motion is denied.

**LEGAL STANDARD**

A motion to dismiss tests the sufficiency of a complaint, not the merits of the case. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quotation marks and citation omitted); s*ee also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court deciding a Rule 12(b)(6)

motion accepts plaintiff's well-pleaded factual allegations as true and draws all possible inferences in the plaintiff's favor. *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 903 (7th Cir. 2011). A plaintiff need not plead "detailed factual allegations," but "still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate under Federal Rule of Civil Procedure 8." *Bell v. City of Chi.*, 835 F.3d 736, 738 (7th Cir. 2016) (quotation marks and citation omitted). Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 127 S. Ct. 1955, 1966 (2007); s*ee also Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009).

## BACKGROUND

Fifth Third is a national bank, headquartered in Cincinnati, Ohio.[1] Weekly opened a checking account at Fifth Third in 2018. In December of 2019, Weekly's wallet was stolen, and the culprit over-drafted his account. Weekly was charged a fee of $100.00 for this over-draft. He called Fifth Third to inform them of the fraudulent withdrawal. A bank representative told him to visit a local branch and complete paperwork to report his stolen wallet and the resulting over-draft.

One month later, in January of 2020, Weekly began receiving collection phone calls from Fifth Third about the unpaid $100.00 over-draft fee. On February 15, 2020, Weekly answered his cell phone and asked why Fifth Third had been "repeatedly"

---

[1] All facts referenced in this Order come from the Complaint unless otherwise specified.

calling him. The Fifth Third representative responded that they were calling about the $100.00 debt. Weekly stated that this debt was invalid because his wallet had been stolen and told the representative to stop calling him. A similar phone call took place two weeks later, on February 28, 2020. Weekly again told the representative not to call him. In total, Fifth Third made twenty-seven phone calls to Weekly's cell phone.

Although the two phone calls each involved conversations with a human representative of Fifth Third, Weekly alleges that the bank was using an automated telephone dialing system ("ATDS") to place the calls. He bases this allegation on the fact that, after he answered each call, he was met with a three-second silent "pause" while the system connected him to a representative. He argues that the volume of calls, and the fact that the calls continued after he asked representatives to stop calling support the inference that his number was being dialed using an ATDS. (Dkt. 21, 5). Count 1 of the Complaint claims the Bank violated the TCPA and Count 2 alleges that it violated the ICFA.

## ANALYSIS

Fifth Third argues both counts should be dismissed. First, it argues that Weekly has not set forth sufficient factual allegations to support a reasonable inference that Fifth Third used an ATDS, and has therefore not met the pleading standard of the TCPA. Second, it argues that these calls were not unfair or deceptive under the ICFA, whether or not they were placed with an ATDS. Each of these arguments is addressed in turn.

**I. TCPA**

In support of its arguments challenging the sufficiency of the TCPA claim, Fifth Third relies on two recent cases: *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458 (7th Cir. 2020) and *Perez v. Quicken Loans, Inc.*, No. 19 CV 2072, 2020 WL 1491145 (N.D. Ill. Mar. 27, 2020).[2]

In *Gadelhak*, the Seventh Circuit reexamined the TCPA's definition of an ATDS. According to the plain text of the TCPA, an ATDS is defined as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(b)(1). The Seventh Circuit held "that the phrase 'using a random or sequential number generator' describes how the telephone numbers must be 'stored' or 'produced.'" *Gadelhak*, 950 F.3d at 468. Up to that point, the definition of an ATDS was "broader [and] include[d] situations where the device dialed numbers from a list, not necessarily a randomly or sequentially generated list." *Mosley v. Gen. Revenue Corp.*, No. 20 CV 01012, 2020 WL 4060767, at *3 (C.D. Ill. July 20, 2020); *see also Blow v. Bijora, Inc.*, 855 F.3d 793, 801 (7th Cir. 2017) (describing how the pre-*Gadelhak* definition of ATDS included "predictive dialers, which dial numbers from customer calling lists") (quotation and citation omitted). *Gadelhak* held that a system which "neither stores nor produces numbers using a random or sequential number

---

[2] Other district courts have considered *Gadelhak* when ruling on motions to dismiss since the parties briefed this motion. *See Mosley v. Gen. Revenue Corp.*, No. 120 CV 01012, 2020 WL 4060767 (C.D. Ill. July 20, 2020); *Klueh v. Paul Vallas for All Chicago*, No. 19 CV 00249, 2020 WL 4934975 (N.D. Ill. Aug. 24, 2020); *and Drew v. Am. Directions Research, Grp.*, No. 20 CV 00402, 2020 WL 6118539, at *2 (N.D. Ill. Oct. 16, 2020).

4

generator [but rather] exclusively dials numbers stored in a customer database [. . .] is not an 'automatic telephone dialing system.'" 950 F.3d at 460.

The impact *Gadelhak* has had on pleading TCPA claims is not entirely clear. In *Mosley*, No. 120 CV 01012, 2020 WL 4060767, at *2, the court observed that "[w]hile *Gadelhak* provided useful guidance on how to interpret the TCPA provisions on ATDS, it was an appeal from the district court's grant of summary judgment. The parties do not present any cases from the Seventh Circuit Court of Appeals that address the pleading requirements for this TCPA violation". The *Perez* court concluded that "the standards for pleading and proving a claim under section 227(b)(1)(iii) have been raised, especially in regard to the [ATDS] element." *Perez*, No. 19 CV 2072, 2020 WL 1491145, at *2. There the court granted a motion to dismiss where the plaintiff, like Weekly, described receiving numerous phone calls, often several in one day, preceded by a "significant pause, lasting several seconds" from a bank that was advertising loans. *Id*. The court allowed Perez to amend her complaint to "include [. . .] more robust allegations about the extent and timing of her interactions with Defendant's representatives, as those details may inform whether she has sufficiently alleged the use of an ATDS" because while "a plaintiff should not be required to plead specific facts as to the technical specifications of the type of call system employed by the defendant, it also cannot be the case that every barebones TCPA claim can survive a motion to dismiss by alleging unwanted calls and a short period of dead air when the call is answered." *Id*. at *3.[3]

---

[3] Prior to *Gadelhak*, courts were routinely denying motions to dismiss when the plaintiff alleged long pauses and repeated phone calls. *See, for example, Husain v. Bank of America, N.A.*, No. 18 CV 07646,

5

However, in *Klueh v. Paul Vallas for All Chicago*, No. 19 CV 00249, 2020 WL 4934975 (N.D. Ill. Aug. 24, 2020), the court noted that *Gadelhak* "was decided at summary judgment, not at the pleading stage before discovery. As other courts have observed (pre-*Gadelhak*), it is unclear how plaintiffs can plead the technical details of the system used by a defendant when the defendant has that information." *Id.* (citations omitted). Critically, *Klueh* noted that "under *Gadelhak*, a system that 'lacks the *capacity* either to store or to produce telephone numbers using a number generator' and instead "dials numbers only from a customer database" is not an ATDS. *Id.* at \*4 (citing *Gadelhak*, 950 F.3d at 464) (emphasis added). But even under *Gadelhak*, a complaint need not "allege that the system *actually deployed* that capacity" in order to qualify as an ATDS and violate the TCPA. *Id.* at \*6 (emphasis added). According to *Klueh*, a dialing system can qualify as an ATDS (as defined by *Gadelhak*) without actually utilizing its capacity for random or sequential number generation so long as it has such capacity. Because it would be impossible for any plaintiff to know about a system's capacity prior to discovery, the *Klueh* court considered three important facts from the complaint before denying the defendant's motion to dismiss.[4]

---

2020 WL 777293 (N.D. Ill. Feb. 18, 2020) (denying a motion to dismiss on similar facts the day before *Gadelhak* was decided); *Hayes v. Receivables Performance Mgmt.*, LLC, 2018 WL 4616309, at \*7 (N.D. Ill. 2018) (finding that plaintiff's allegations of experiencing the distinctive "click and pause" and "dead air" after answering calls from defendant were sufficient to support the reasonable inference that an ATDS was used).

[4] The *Klueh* court also noted that the plaintiff had actually alleged both that the defendant used a list or database, and that it used a random number generator. The court noted that these poorly crafted and arguably conflictual allegations undermined the plaintiff's claim. *Id.* at \*6. Weekly has done something similar here, alleging that "Defendant's phone system stores telephone numbers to be

6

First, like the *Perez* court, it considered the "nature" of the alleged violations (in that case, text messages that were not personalized with the recipient's name). *Id*. at *6. Generic messages could be sent from an ATDS system with the capacity to generate random or sequential numbers (whether or not the messages were sent using that capacity), but they could just as easily have been sent by a system that only "dial[ed] from a list or database." *Id*. Therefore, this factor was inconclusive. Next, the *Klueh* court noted the "high volume" of messages, and determined that neither helped nor hurt the plaintiff, for the same reason. *Id*. Finally, it considered whether the system in question was "tailored to a particular industry that might or might not tend to use random or sequential number generation capacity." Other district courts in the Seventh Circuit have relied on similar analysis when applying *Gadelhak* at the motion to dismiss stage. *See, for example, Mosley*, 2020 WL 4060767, at *4 ("no plaintiff ought to be held to a standard that requires the plaintiff to plead technical information to which they could not have pre-discovery. However, a pause alone may not always be sufficient to plausibly claim the defendant was using an ATDS, especially if the business of the defendant is such that it would not need a machine with random or sequential number generation capacities."); *Drew v. Am. Directions Research, Grp.*, No. 20 CV 00402, 2020 WL 6118539, at *2 (N.D. Ill. Oct. 16, 2020) ("the plaintiff must allege and later prove that the equipment that originated the contact was capable of either storing or producing telephone numbers using a random or sequential number generator" but a showing of "a high volume" of

---

called, using a random or sequential number generator." (Complaint, ¶ 33). Like in *Klueh*, the Court finds this is not dispositive.

7

text messages that were personalized with recipients' names survived a motion to dismiss, despite that fact that the system also had the non-ATDS-qualifying capacity to send communications using a list of numbers).

The Court weighs each of these factors when evaluating Fifth Third's arguments for dismissal, below.

**A. Nature of Calls**

Fifth Third argues that, with respect to the two calls that Weekly answered in February, "no details are provided regarding how long the calls were, to whom the Plaintiff actually spoke, what time of day the calls occurred, what was said during the calls, or what was said in response to Plaintiff's purported demand to cease communications." (Dkt. 14, at 4).[5] The Complaint says that "[o]n or around February 15, 2020, Plaintiff answered a call from Defendant. Plaintiff asked why Defendant was repeatedly calling him. Defendant stated that it was attempting to collect upon the subject debt. Once again, Plaintiff stated that he had lost his wallet and that the subject debt was invalid. Defendant's representative asked Plaintiff to pay the subject debt despite him stating that it was invalid. Plaintiff reiterated that he did not owe the subject debt and demanded that Defendant stop calling him." (Dkt. 1, at 2–3).

---

[5] Fifth Third also argues that Weekly has not provided enough information about the content of the calls he didn't answer, saying "with the exception of two calls on February 15th and February 28th, no specifics are provided regarding [. . .] who Plaintiff spoke to (if anyone), or what the subject of the calls were." (Dkt. 14, at 3). Fifth Third then asserts "it is unclear how Plaintiff has concluded how the calls were made, or that the calls were made in an attempt to collect the 'subject debt' if he did not answer the calls or speak with anyone." (*Id*. at 4). At the pleading stage, the TCPA, enacted to protect consumers, does not require a Plaintiff to answer and document every attempted telephone contact. Weekly has alleged that 27 phone calls came from the same phone number. Based on the contents of the phone calls he did answer, he has credibly alleged that all 27 of the calls from this number came from Fifth Third and concerned his debt. At this stage the Court will not require more.

8

What matters to the Court is whether the content of these calls tends to support Weekly's claim that Fifth Third was using a system with the capacity to store or produce numbers using random or sequential number generation. The personalized nature of the calls Weekly received (*i.e.* they described Weekly's debt to Fifth Third, rather than a general solicitation) suggests that the system was "dial[ing] numbers only from a customer database." *Gadelhak*, 950 F.3d at 464. However, as the court determined in *Klueh* and *Drew*, this fact is not dispositive because a system need only have "the *capacity* either to store or to produce telephone numbers using a number generator" to qualify as an ATDS. *Klueh*, No. 19 CV 00249, 2020 WL 4934975, at *6.

### B. Volume and Frequency of Calls

Weekly has alleged that he received 27 calls in three months. This is more than the 15 calls that the plaintiff in *Perez* received, but it does not come close to the alleged thousands of calls to thousands of other voters alleged in *Klueh*. Again, however, this factor is not dispositive because the number of calls actually made is not determinative of whether the system possessed the capacity for random number generation or storage.

Weekly also alleges that at times "multiple calls [were received] in one day," calls were received "on back to back days," and calls were received "on weekends."[6]

---

[6] Fifth Third argues that without knowing the exact dates of the unanswered calls, the Court cannot be sure that all 25 of them did not occur before Weekly answered the phone and communicated his revocation of consent. (Dkt 23, at 2). This misstates the Complaint. Weekly alleges that he revoked his consent on or around February 15th. He also alleges that he answered one additional unwanted call on February 28th, and that "Defendant continued its phone harassment campaign" after "failing to acquiesce to Plaintiff's demands to cease calling him." (Dkt. 1, at 3). Therefore, Weekly plainly alleges that at least one answered call and one unanswered call (though likely more, since "campaign" does

9

(Dkt. 1, at 3). These seemingly random dates and times neither support nor rebut the inference that a system with the capacities of an ATDS was being used.[7]

### C. Practices of the Industry

The final factor considered by the *Klueh* and *Mobley* courts was whether the defendant's industry suggests that their system has the capacities of an ATDS, regardless of whether those capacities were utilized when they contacted the plaintiff.

In *Klueh*, the court held that because the platform wasn't "tailored to a particular industry that might or might not tend to use random or sequential number generation capacity" the court could not resolve technical questions about the system's capacity on a motion to dismiss. *Klueh*, No. 19-CV-00249, 2020 WL 4934975, at *6. In *Mosley*, the court held that "a pause alone may not always be sufficient to plausibly claim the defendant was using an ATDS, especially if the business of the defendant is such that it would not need a machine with random or sequential number generation capacities." It specifically noted that "[b]anks may intend to contact individuals with whom there is already a preexisting relationship, such as a mortgagor, but banks may also intend to solicit clients through random number

---

not usually denote a single event) were made after he revoked his consent to be called on February 15th.

[7] Weekly argues in his Response that "[t]he fact that Defendant's phone system continued to place calls after Defendant was aware that Plaintiff did not wish to receive further calls clearly evinces the fact that Defendant's system stored Plaintiff's phone number and continued to randomly auto-dial that number. There would be no reason for Defendant to continue to contact Plaintiff, especially after having been notified to cease all telephone communications. Yet, Defendant's ATDS continued to keep Plaintiff's phone number stored, causing its system to randomly dial the number dozens of times thereafter." (Dkt. 21, at 5). This argument appears to misapprehend the Seventh Circuit's definition of an ATDS. The word "random" refers to the production and storage of the telephone numbers, not the order in which telephone numbers are called. *See Gadelhak*, 950 F.3d at 467–68.

10

generation. Thus, it is plausible that the bank's telephone system might have the capacity to use randomly or sequentially generated phone numbers." *Mosley*, No. 120 CV 01012, 2020 WL 4060767, at *2–4. In *Drew*, the court held that "a survey research provider, is significantly more likely to employ a random or sequential number generator than a debt collection company." *Drew*, No. 20 CV 00402, 2020 WL 6118539, at *2–3. In *Perez*, the plaintiff had never been a customer of the defendant, a lender called Quicken Loans. The Court found that even in light of these facts, and in combination with the allegation that each call began with a pause, the plaintiff in Perez had not pleaded sufficient facts to survive a motion to dismiss. *Perez*, No. 19 CV 2072, 2020 WL 1491145, at *2.

Fifth Third is a bank that in this instance was calling a current customer about the collection of a debt. This Court finds the reasoning in *Mosely* persuasive that banks are likely to use systems that have the capacity to store or produce numbers using a random or sequential number generator, in order to contact current and *potential* customers. *See Mosley,* No. 120 CV 01012JESJEH, 2020 WL 4060767, at *2–4.[8] Debt collection is not a function that requires this capacity, as the court noted in *Drew*, but what matters is whether the system had the capacity, not whether it was utilized. *Drew*, No. 20 CV 00402, 2020 WL 6118539, at *2–3; *Klueh*, No. 19 CV 00249, 2020 WL 4934975, at *6. Therefore, the motion to dismiss is denied. The parties are directed to engage in staggered discovery limited first to determining

---

[8] *Perez* does not address whether the defendant's industry should factor into the analysis.

11

whether the system used to call Weekly had the capacities of an ATDS as defined in *Gadhalek*.

## II. ICFA

The ICFA protects "consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010) (citing *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403 (Ill. 2002)). In order to make out a claim under the ICFA, Weekly must show (1) a deceptive or unfair act or practice by Fifth Third, (2) that Fifth Third intended Plaintiff to rely on the deceptive or unfair practice; (3) that the unfair or deceptive practice occurred during a course of conduct involving trade or commerce; and (4) that the deceptive or unfair act or practice was the proximate cause of the injury. *Id*. Weekly initially alleged both unfair and deceptive practices. (Complaint, at 7). However, because he failed to respond to Fifth Third's arguments regarding deceptive practices, that claim is waived. The Court will only consider Weekly's allegations of unfair acts as defined by the ICFA.

### A. Unfair Acts

The parties agree that in determining whether conduct is "unfair" under the ICFA, Illinois courts consider: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers." *Robinson*, 201 Ill. 2d at 417–18. They also agree that a "practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id*. (citation omitted).

12

1. <u>Public Policy</u>

Weekly argues that Fifth Third's conduct offends public policy because it violates both the TCPA and the Illinois Telephone Solicitations Act ("ITSA").

The ITSA prohibits just what its name suggests—telephone solicitations. *See* 815 Ill. Comp. Stat. Ann. 413/25(b) ("[i]t is a violation of this Act to continue with a solicitation placed by a live operator without the consent of the called party"). Fifth Third was not soliciting business from Weekly, so it was not violating this Act. *See* 815 Ill. Comp. Stat. Ann. 413/5 ("Telephone solicitation" means any communication through the use of a telephone by live operators for soliciting the sale of goods or services.").

However, as noted above, Weekly has pled sufficient facts to make out a plausible claim for relief under the TCPA. Therefore, the public policy prong of the test for unfair acts weighs in his favor. *See Messina v. Green Tree Servicing, LLC*, 210 F. Supp. 3d 992, 1004 (N.D. Ill. 2016) ("a genuine issue of material fact remains as to whether Green Tree's dialer calls violated the TCPA. Construing the facts in plaintiffs' favor, as the court must for the non-movant, the court will assume that this factor weighs in plaintiffs' favor.); *Dolemba v. Illinois Farmers Ins. Co.*, 213 F. Supp. 3d 988, 998 (N.D. Ill. 2016) ("an alleged violation of federal law, which must be taken as true for the purposes of this analysis, offends public policy."); *G.M. Sign, Inc. v. Stergo*, 681 F. Supp. 2d 929, 935 (N.D. Ill. 2009) (finding that an unsolicited fax advertisement violates the TCPA and is thus presumptively against public policy).

13

2. Oppressive

Both parties acknowledge that "[c]onduct is oppressive only if it imposes a lack of meaningful choice or an unreasonable burden on its target." *Centerline Equipment Corp. v. Banner Personnel Service*, 545 F. Supp. 2d 768, 780 (N.D. Ill. 2008). Weekly argues that he had "no meaningful choice in receiving the calls placed by Defendant." (Dkt. 21, at 12). But Weekly chose not to answer most of the calls, at least mitigating the burden. And because they all came from the same phone number, perhaps he could have blocked that number, as Fifth Third argues. (Dkt. 23, at 8). This is a close call, and Fifth Third will have the opportunity to prove that Weekly had that option.

In *Messina v. Green Tree Servicing, LLC*, 210 F. Supp. 3d 992, 1004 (N.D. Ill. 2016), the District Court found that the "oppressiveness" prong weighed in the plaintiff's favor when the plaintiff "received upwards of fifty unconsented-to dialer calls." By contrast, in *Dolemba v. Illinois Farmers Ins. Co.*, 213 F. Supp. 3d 988, 998 (N.D. Ill. 2016), "the transmission of a single prerecorded message to an unconsenting consumer" was found not to be oppressive. Weekly's circumstances fall somewhere in between these two cases.

3. Substantial Injury

Courts have held that "[e]ven very small individual harms can be considered substantial, if they are part of a practice that, in the aggregate, causes substantial losses to the public as a whole." *Centerline*, 545 F.Supp.2d at 780 (citations omitted). However, the harm or injury "must include or arise from actual *economic* damages that are more than de minimis or trifling in amount." *Dolemba*, 213 F. Supp. 3d 988,

14

998 (N.D. Ill. 2016) (emphasis added). Weekly seeks damages for "diminished value and utility of telephone equipment and telephone subscription services, the loss of battery charge, and the per-kilowatt electricity costs required to recharge his cellular telephone as a result of increased usage of his telephone services." (Dkt. 1, at 4). These damages are undeniably small. *See Stonecrafters, Inc.*, 633 F. Supp. 2d at 617 (costs associated with receiving and printing a single unwanted fax could not be characterized as significant harm); *Warciak v. One, Inc.*, No. 16 C 7426, 2016 WL 7374278, at *14 (N.D. Ill. Dec. 20, 2016) (loss of kilowatt hours of phone battery from the receipt of a *single* text message was not substantial harm, because it was less than the cost of the "paper and ink required for a single fax"); *Dolemba v. Kelly Servs., Inc.*, No. 16 C 4971, 2017 WL 429572, at *4 (N.D. Ill. Jan. 31, 2017) ("loss of time and loss of battery life" associated with a single phone call was "so negligible from an economic standpoint as to render any damages unquantifiable"). The costs associated with receiving 27 phone calls are greater than to the costs associated with receiving one call or one text message. For the foregoing reasons, the Court cannot say that Weekly has failed to allege substantial harm.[9]

The "public policy" prong weighs strongly in Weekly's favor. The "oppressiveness" prong also weighs in his favor, though barely. While he has alleged minute economic damages, these may still constitute "substantial harm." On balance,

---

[9] Weekly asserts that time and money spent defending against debt collection attempts can constitute damages under the ICFA. *See Thompson v. CACH, LLC*, No. 14 CV 0313, 2014 WL 5420137, at *8 (N.D. Ill. Oct. 24, 2014) ("[s]ome courts have found a plaintiff's expenditure of time and money incident to defending a debt collection effort to suffice as damages under the ICFA"). First, the cases Weekly cites are considering damages associated with "deceptive practices" under the ICFA. More to the point, beyond answering the two phone calls, Weekly has not alleged any costs associated with defending against debt collection efforts.

Weekly's Complaint contains facts which, if true, properly allege unfair acts under the ICFA.

## **CONCLUSION**

Fifth Third's motion to dismiss (Dkt. 13) is denied. Parties should meet and confer about discovery, and file a joint status report on March 31, 2021.

E N T E R:

Dated: December 22, 2020

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge

16